WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

.

| | |
|---|---|
| Daniella Marie Gracia, | No. CV-20-00451-TUC-LCK |
| Plaintiff, | **ORDER** |
| v. | |
| Chris Nanos, Ofelia Dorsey, and William Grimsey, | |
| Defendants. | |

Pending before the Court is Plaintiff Gracia's Motion for Summary Judgment with accompanying statement of facts (Docs. 85-88) and Defendants' Motion for Judgment on the Pleadings and Motion for Summary Judgment with accompanying statement of facts (Docs. 94-95). The parties have filed responses and replies to the motions. (Docs. 100-05.) Gracia also filed two additional attachments and a notice of errata. (Docs. 107-09.) The Court heard oral argument on the motions on May 1, 2023, and took the motions under advisement. (Doc. 110.) The Court finds it most expeditious to address all of the claims under the summary judgment standard, rather than ruling on Defendants' request for judgment on the pleadings as to specific claims. After review of the briefs and the evidence submitted, and considering the parties' oral arguments, the Court grants summary judgment in Defendants' favor as to all claims.

## SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the party opposing the

motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1289 (9th Cir. 1987). Summary judgment is appropriate if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## **FACTS**[1]

No one disputes that Plaintiff Gracia was brought to the Pima County Adult Detention Center (PCADC) in the early hours of October 21, 2019. On that day, Defendant Grimsey was a corrections sergeant working as a shift supervisor until 6:30 a.m. (Doc. 86, Ex. 11 at 6-7.) An October 28 report found Gracia's blood alcohol content (BAC) was .219, based on testing of her blood drawn shortly before her arrival at PCADC. (Doc. 95, Ex. C at 2, 13.)

At an unknown time, Nurse Joyce Dower documented in a Healthcare Receiving Screen, that Gracia reported experiencing flair ups with sciatica due to an accident "years ago." (Doc. 86, Ex. 4 at 019.) There is no evidence Defendants had notice of this information. The PCADC initial intake form states that Gracia went through a metal detector and was given a pat search. (*Id.* at 032.) Defendant Corrections Officer Ofelia Dorsey testified that Gracia reported having back pain just before Dorsey conducted the

---

[1] The Court compiled all of the facts presented by either party to the extent they were relevant and supported by the cited portions of the record. In Gracia's Controverting Statement of Facts, in response to Defendants' Motion for Summary Judgment, Gracia cites to her Amended Complaint, which Defendants attached as an exhibit to their Statement of Facts. Because the Amended Complaint is unverified, Gracia cannot rely upon it as evidence to oppose a motion for summary judgment. *Moran v. Selig*, 447 F.3d 748, 759 (9th Cir. 2006). However, because Gracia's factual assertions in the Amended Complaint are treated as judicial admissions, they are binding on Gracia with respect to Defendants' motion for summary judgment. *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). Additionally, in the briefing Gracia refers to a Plaintiff's expert (Doc. 104 at 8); however, no expert report was cited in, or attached to, Gracia's statement of facts.

pat down. (*Id.* at 011, 032-33.) Defendant Dorsey observed that Gracia reacted as if she was in significant pain when Dorsey touched her gently on her back, and Dorsey found the response to be exaggerated. (*Id.* at 011-12.)

Defendant Dorsey documented in writing that Gracia "refused to obey orders, very sarcastic and refused to dress out at first. Almost ended up strapped to a chair." (*Id.* at 032; Doc. 95, Ex. E at 22-23.) The officer testified similarly that Gracia was angry at times, and, during the dress-out process, her behavior was erratic, she was argumentative, and she did not want to cooperate. (Doc. 95, Ex. E at 13, 15, 46.) Gracia attested that she was cooperative during the dress-out process and made no verbal threats to any staff members. (Doc. 86, Ex. 16 ¶¶ 2, 10.) Gracia was placed in a holding cell. (Doc. 95, Ex. B at 23-24, Ex. E at 14-15.)

At 4:20 a.m., Summer Berry, a mental health professional, documented that Gracia refused to answer questions from her. (Doc. 95, Ex. H at 20-23, Ex. J at 19.) On a Suicide/Self-Injury Risk Assessment, Berry noted that Gracia was uncooperative, nonresponsive to questions, and hostile. (Doc. 86, Ex. 4 at 023-24, 026.) After being told she could be placed in the most restrictive environment for lack of participation, staff reported that Gracia took off her shirt, dropped her pants, and yelled at Berry, but did not answer screening questions. (*Id.* at 024; Doc. 95, Ex. B at 24, Ex. H at 23, Ex. J at 19.) At 4:21 a.m., Berry placed Gracia on suicide watch due to her being uncooperative and unable to ensure her own safety. (Doc. 86, Ex. 4 at 044.) In contrast, Gracia declared that she did not refuse to answer any questions from medical staff, she was not a danger to herself or others at any point, and she made no statements indicating she was suicidal. (Doc. 86, Ex. 16 ¶¶ 8-9.)

The Pima County Sheriff's Department Corrections Bureau Standard Operating Procedures state that a new arrestee placed on suicide watch may remain in intake or be moved to the Mental Health Unit (MHU); however, if inmates need to be placed in a holding cell "to control their activity," they will be taken to the MHU. (Doc. 86, Ex. 6, D5SD.000188-89 ¶¶ 5, 6(5).) Berry testified that an inmate on suicide watch may remain

at intake if they are following directives. (Doc. 86, Ex. 5 at 44-45.) The decision to move an inmate to the MHU is made by medical staff and the Intake Sergeant. (Doc. 86, Ex. 6, D5SD.000188-89 ¶ 5(1).) Defendant Grimsey testified that Gracia had to be transferred to the MHU because she was already in a holding cell when she was placed on suicide watch, and a 5-minute suicide watch cannot be conducted on a detainee in an intake holding cell. (Doc. 95, Ex. I at 9-10, Ex. E at 51.) Defendants Dorsey and Grimsey escorted Gracia to the MHU. (Doc. 86, Ex. 3 at 18.) Corrections officers are directed to document on a log the activities of a detainee on suicide watch. (Doc. 86, Ex. 6 at D5SD.000187 ¶ 3(2).)

When a detainee is taken to the MHU, a more extensive search is required, including a Body Cavity Inspection (BCI). (Doc. 95, Ex. E at 30, 51, Ex. I at 9.) A BCI will be conducted for inmates that are not attending an initial court appearance, <u>will be moved to housing prior to an initial appearance,</u> and those transferred to housing from the ID Unit. (Doc. 86, Ex. 9 at D1SD.000014 ¶ V(A)(7)&(8).) Defendant Grimsey testified that there are no policies allowing an alternative to the BCI for a person unable to complete it. (Doc. 86, Ex. 11 at 20-21.) Defendants averred that a BCI may vary and "should be tailored to the circumstances presented to ensure safety of all involved." (Doc. 86, Ex. 8 at 2 ¶ 1.)

Defendant Dorsey took Gracia into the shower area with another female officer, Erica McShea, while Defendant Grimsey stayed behind a partition. (Doc. 95, Ex. 3 at 30, 41.) PCADC policy details the substance of a BCI at that facility, and includes that the person "squat down and cough several times. . . . stand up and bend forward at the waist and spread their buttocks." (Doc. 86, Ex. 9 D1SD.000020 ¶ VII(D)(2)(c).) Defendant Dorsey documented that Gracia had a "defiant and argumentative attitude." (Doc. 86, Ex. 4 at 55.) The female officers conducted several parts of a visual BCI. (Doc. 86, Ex. 3 at 30-31, Ex. 4 at 55.) Gracia bent over a little but told the officers that, due to back issues, she could not bend over, cough, and squat, as they had directed. (Doc. 86, Ex. 3 at 30, 31; Doc. 95, Ex. B at 27-28.) Defendant Dorsey documented that Gracia refused to comply

with the remainder of the BCI. (Doc. 86, Ex. 4 at 55.) It occurred to Defendant Dorsey that Gracia may not be able to bend over due to back pain. (Doc. 86, Ex. 3 at 33.) Gracia testified that Defendant Dorsey pushed her on the back, causing her pain, and she fell to the floor with a cry. (Doc. 95, Ex. B at 28.) In contrast, Defendant Dorsey testified that Gracia turned angrily to Officer McShea, and the two officers took Gracia to the floor. (Doc. 86, Ex. 3 at 31, 34-35, 41, 45, Ex. 4 at 54-55.) Defendant Grimsey entered the shower area and, upon seeing that Gracia was refusing to give up her arms in a struggle, he testified that he activated his taser and told her he would use it if she did not put her hands on her back. (Doc. 86, Ex. 11 at 18; Doc. 95, Ex. B at 28.) Gracia was covered with a smock and taken to a cell. (Doc. 86, Ex. 4 at 54-55.)

Defendant Grimsey testified that, when an inmate refuses a search, it creates a threat that contraband may enter the facility and cause harm to the inmate or others. (Doc. 86, Ex. 11 at 15, Ex. 9 at D1SD.000010.) In that event, the person will be placed in a restraint chair or on a restraint board. (Doc. 86, Ex. 11 at 13-14.) Defendant Dorsey testified that, when an inmate does not cooperate, staff will strap them down until they are calm and agree to comply with the procedures. (Doc. 86, Ex. 3 at 17.) PCADC policy allows use of a restraint chair for new inmates that fail to comply with the search process. (Doc. 86, Ex. 9 at D1SD.000007 ¶ V(C)(5).) While an inmate is in restraints, officers shall conduct rounds every 15 minutes and, when it is practical, will provide opportunities for water and use of the restroom, and the changing of position every two hours. (*Id.* at 000006 ¶ V(B)(6)(a)&(b), 000007 ¶ V(D)(3).) If an inmate is in a secured cell, she should not be restrained if she does not have the means to carry out a threat of violence against herself or others. (*Id.* at 000004 ¶ D(1).)

Defendant Grimsey directed that Gracia be placed on a four-point restraint board, which occurred at approximately 4:30 a.m. (Doc. 86, Ex. 4 at 054.) He documented that Gracia was placed on a restraint board because she refused to complete the BCI, and he was concerned about dangerous contraband (*id.*); Officer McShea stated that Gracia was placed on the restraint board "due to her behavior" (*id.* at 55). Gracia testified that staff

notified her she would remain on the restraint board until she complied with a BCI. (Doc. 95, Ex. B at 20-21, 31.) After Defendant Dorsey secured Gracia's right wrist to the restraint board, she had no further involvement with Gracia. (Doc. 95, Ex. E at 45.) There is no evidence that Defendant Grimsey had further interactions with Gracia or any involvement with her treatment while on the restraint board.

According to PCADC policy, restraints will be removed when an inmate becomes cooperative. (Doc. 86, Ex. 9 at D1SD.000006 ¶ V(B)(7)(b).) Gracia was checked by medical staff once an hour and remained restrained for 4 hours and 10 minutes. (Doc. 86, Ex. 4 at 15-16, 51, 53; Doc. 95, Ex. B at 32, Ex. J at 16.) Nurse Dower testified that, on an initial check, she would have made sure the restraints were not too tight. (Doc. 95, Ex. K at 21-22.) None of the medical checks documented any abnormal findings. (*Id.* at 33, Ex. J at 16, 28, 29, 31.) At 5:35 a.m., Gracia informed Nurse Dower that she was cold, experiencing left arm numbness, and needed to urinate; she had pulled her right arm out of the restraint. (Doc. 86, Ex. 4 at 16; Doc. 95, Ex. B at 32, Ex. J at 16c.) At a 6:35 a.m. check, Gracia did not request water. (Doc. 86, Ex. 4 at 15.) However, she asked to be taken out of restraints to urinate and was reminded that "there is a floor drain that is used during restraining for safety and compliance." (*Id.*) Gracia averred that when she asked to be released to urinate, she was told, "just piss yourself." (Doc. 86, Ex. 16 ¶ 13.) At that time, Sergeant Estrada documented a need to continue restraints because Gracia was uncooperative with the search process. (Doc. 95, Ex. J at 16.) At 7:30 a.m., it was documented that Gracia was talkative and cooperative. (*Id.*) At 8:09 a.m., Gracia agreed to complete a BCI. (Doc. 17 ¶ 24.) Personnel at PCADC did not document any injury to Gracia while on the restraint board. (Doc. 95, Ex. J at 16, 28, 29, 31.)

At 8:30 a.m., Gracia was released from restraints and a BCI and body scan were completed. (Doc. 86, Ex. 4 at 51, 53, Ex. 11 at 19.) Plaintiff testified that she agreed to the BCI because she felt she had no choice if she did not want to remain restrained indefinitely, but she found the BCI very painful. (Doc. 95, Ex. B at 32-33.) Gracia was released from the PCADC shortly before noon on October 21, 2019. (Doc. 17 ¶¶ 27, 32.)

Defendants submitted a video that documented, without audio, almost the entirety of Gracia's time at the PCADC, with the exception of the BCIs. (Doc. 95, Ex. F.) The Court has reviewed the entirety of the video.

Gracia visited an emergency room the afternoon of October 21, reported that she had been restrained and assaulted by corrections officers, and asked to have her visible bruising documented. (Doc. 95, Ex. L at D1DS.000075-76, Ex. B at 36, 38-39.) She was diagnosed with a contusion of her right wrist, right hand paresthesia, left wrist bruising and swelling, contusions of both elbows, and elevated blood pressure; no treatment was provided. (Doc. 86, Ex. 9 at D1SD.000065; Doc. 95, Ex. L at D1SD.000077-78, Ex. B at 46.) Gracia has not been diagnosed or treated for other injuries incurred while at PCADC. (Doc. 95, Ex. B at 47-49, 61-62.)

## **DISCUSSION**

Gracia alleges her right to due process was violated when Defendants Dorsey and Grimsey punished her by requiring her to participate in a BCI and placing her on a restraint board on October 21, 2019. (Doc. 17.) Gracia also alleges that Defendants Grimsey and Nanos are liable for the conduct of others that acted according to custom and practice. (*Id.*) Finally, she alleges all Defendants are liable for gross negligence. (*Id.*)

The Court identified only two points of factual disagreement between the parties. First, Gracia averred that she was cooperative during the initial dress-out process, while Defendant Dorsey documented that Gracia was uncooperative, sarcastic, and non-compliant. Viewing the evidence most favorably to Gracia, the Court assumes she was cooperative at that time. Regardless, Gracia was placed in a holding cell. There is no evidence that Gracia's location in a holding cell had any impact on Berry (a non-defendant) placing her on a suicide watch (which triggered the BCI). For that reason, this factual disagreement is not material.

Second, Gracia testified that, during the initial BCI, she fell to the floor in pain, while Defendant Dorsey testified that Gracia was taken to the floor by officers when she turned on them with aggression. The Court also finds this dispute not material to

resolution of the motions. Accepting Gracia's testimony that she fell to the floor, she did not dispute Defendant Grimsey's testimony that he witnessed her struggling against the officers while on the floor. More importantly, there is agreement that Gracia did not complete a full BCI at that time. And there is no factual dispute that Gracia did not express willingness to participate in a full BCI until after 8 a.m.

Defendants allege that Gracia's constitutional rights were not violated by their actions. Further, Defendants Grimsey and Dorsey contend they are entitled to qualified immunity. Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009). The Court first will examine the constitutional claims as necessary to resolve part one of the qualified immunity standard.

**Due Process**

To obtain relief pursuant to § 1983, Gracia must establish that (1) Defendants acted under color of state law, and (2) deprived her of a right guaranteed by the United States Constitution. *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986). Defendants do not dispute that they were acting under color of state law at all relevant times. For liability under § 1983, there must be individual personal participation in the alleged deprivation of the constitutional right, it is not enough that the person was present or part of a group." *See Jones v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

The constitutional right at issue is that a person held in state detention, prior to trial, has a Fourteenth Amendment due process right not to be punished.[2] *Bell v. Wolfish*,

---

[2] Gracia also alleges a violation of her Fifth Amendment right to due process. The Fifth Amendment due process protection applies only to actions by federal actors. Here, Defendants are state actors. Therefore, only the Fourteenth Amendment is at issue in this

441 U.S. 520, 535 (1979). A defendant's conduct qualifies as punishment if, "(1) that action [ ] cause[d] the detainee to suffer some harm or 'disability,' and (2) the purpose of the governmental action [is] to punish the detainee." *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004) (citing *Bell*, 441 U.S. at 538)). The harm suffered "must either significantly exceed, or be independent of, the inherent discomforts of confinement." *Id.* at 1030 (citing *Bell*, 441 U.S. at 537). Defendants concede that Gracia has asserted sufficient harm when all inferences are drawn in her favor. Thus, the Court focuses on the second factor, whether Defendants intended to punish Gracia.

The primary "punishment" that Gracia cites is her restraint on a board. However, because that restraint ties back to prior actions by Gracia and Defendants, the Court evaluates some of that earlier conduct as well. Defendant Grimsey documented that Gracia was placed on a restraint board because she refused to complete the BCI, and he was concerned about dangerous contraband. (Doc. 86, Ex. 4 at 054.) Defendant Gracia's testimony comports with that documentation, as she stated staff notified her that she would remain on the restraint board until she agreed to complete a BCI. (Doc. 95, Ex. B at 20-21, 31.)

The only evidence Gracia cited as evidence of an express intent to punish was Defendant Dorsey's notation that Gracia "refused to obey orders, very sarcastic and refused to dress out at first. Almost ended up strapped to a chair." (*Id.*, Ex. E at 22-23.) Gracia argues that this documentation by Defendant Dorsey demonstrated that she had an intent to punish/restrain Gracia, from the start of their interactions, for being sarcastic. The form completed by Defendant Dorsey asked her to identify whether Gracia was cooperative or uncooperative, followed by a space for comments. Defendant Dorsey's comments explained her finding that Gracia was uncooperative. Defendant Dorsey noted not just sarcasm, but that Gracia refused to obey orders and to dress out when first asked. PCADC policy provides for restraint in a chair if a detainee fails to comply with the

---

case. *See Bingue v. Prunchak*, 512 F.3d 1169, 1174 (9th Cir. 2008). The Court also notes that Gracia did not bring a Fourth Amendment claim alleging an unreasonable search.

search process. Because Dorsey determined that Gracia was resisting compliance with the initial search, which occurs during the "dress out" process, the institutional policy allowed for restraint. (Doc. 86, Ex. 11 at 14-15 (explaining that the initial search is commonly referred to as part of dress-out).) The notation of sarcasm does not suggest that Defendant Dorsey considered restraining her for that reason, rather than for failure to comply with a search procedure. Even accepting Gracia's attestation that she was cooperative with the procedure, Defendant Dorsey did not have decision-making authority with respect to the conduct that Gracia identified as punishment – requiring a BCI and restraining Gracia on a board. Thus, her feelings or intent toward Gracia were of limited import. This finding is supported by the fact that an initial search was completed, and Defendant Dorsey did not impose a restraint at that time. The evidence, even when construed in Gracia's favor does not reveal that Defendant Dorsey intended to punish Gracia.

     If there is no evidence of an express intention to punish, a court must evaluate the non-punitive stated purpose of the condition imposed:

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted.

*Bell*, 441 U.S. at 538-39. A defendant need not have employed the "least restrictive alternative," *Valdez v. Rosenbaum*, 302 F.3d 1039, 1046 (9th Cir. 2002); however, if a defendant had "many alternative and less harsh methods" from which to select, that may evince an intention to punish, *Bell*, 441 U.S. at 539 n.20. Retribution is a form of punishment and does not serve a legitimate government interest. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963). And restrictions that are "excessive in relation to" the stated legitimate purpose are precluded. *Bell*, 441 U.S. at 538.

     A pretrial detainee may lawfully be subject to restrictions that are "reasonably related to the institution's interest in maintaining jail security" or "effective management of the detention facility." *Id.* at 540 (finding jail security, including the exclusion of

contraband, is a "valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment."). When evaluating whether a particular restriction is reasonably related to the institution's security, courts typically defer to corrections officials, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations." *Id.* at 540 n.23 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)). The Court need not "agree with the defendants" or find that the "policy in fact advances the jail's legitimate interests," it must determine only if the defendants' conduct was "'rational,' that is, whether the defendants might reasonably have thought that the policy would advance its interests." *Valdez*, 302 F.3d at 1046 (quoting *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999) (en banc)).

The Court now focuses on whether the conditions to which Gracia was subjected were reasonably related to a legitimate government interest. Gracia argues that PCADC policy forbid use of a restraint board to enforce compliance with the rules. And that Defendants failure to follow PCADC's rules demonstrated the lack of a legitimate penological purpose. Contrary to her argument, however, PCADC policy does not include such a prohibition. The policies explicitly allowed the use of a restraint chair when a new arrestee failed to comply with search protocol. A restraint chair had seven restraint points and could not be used for more than two hours, while restraint on a board could last for 8 or more hours and involved only a four-point restraint for Gracia. (Doc. 86, Ex. 9 D1SD.000003 ¶ I, D1SD.000006-07 ¶¶ V(C)(1), VI(B)(1).) Nothing in the policy forbid use of a board, which appears to be less restrictive than a chair. Because Defendants' conduct in restraining Gracia on a board was not a violation of the facility's policies, Gracia's argument fails to establish that the restraint lacked a legitimate penological purpose.[3]

---

[3] When asked, Gracia told Nurse Dower that she did not know if she was pregnant; a pregnancy test was scheduled but not completed prior to the officers placing her in restraints. (Doc. 86, Ex. 12 at 021.) Gracia asserts that this action by Defendants demonstrated a willingness to violate policy, which does not serve a penological purpose. The standard restraint policy does not apply to inmates that are pregnant; PCADC has a

Gracia further argues that there was no legitimate penological interest in putting her on a restraint board for 4 hours and, during that time, not offering her water, releasing her to urinate, or allowing her to change position. Gracia also contends the policy required that a corrections officer check on her every fifteen minutes and that was not done. PCADC policy indicates that a detainee shall be allowed water, release to use the bathroom, and a change of position, if those things are "practical." After the initial placement of Gracia on the restraint board, Defendants Grimsey and Dorsey were not involved in the continuation of the restraint, monitoring Gracia, or decisions regarding whether to allow her temporary release or water.[4] After two hours, Sergeant Estrada signed the form as a Shift Supervisor; and at a four-hour assessment, Sergeant Lopez signed the form as the Shift Supervisor that authorized her release. In addition, a member of the medical staff checked on Gracia hourly. Because there is no evidence that Defendants Grimsey or Dorsey participated beyond Gracia's initial restraint, they cannot be held responsible for any constitutional violations after that time. Additionally, the fact that restraint was continued by other corrections officers undermines Gracia's argument that Defendants' intent in restraining her was punishment.

Gracia also argues that PCADC policy did not require that she be taken to a secure unit solely because she was placed on suicide watch. And, if Defendants had kept her in the intake area, a BCI would not have been required. PCADC policy allows two placement options for a detainee on suicide watch, remain in intake or be transferred to the MHU. Transferring Gracia to the MHU was, at a minimum, allowable under the

---

policy regarding restraint of pregnant inmates, but Gracia did not provide that policy section to the Court. (Doc. 86, Ex. 9 at D1SD.000005 ¶¶ III, IV.) Although pregnancy had not been ruled out, no Defendant had reason to believe Gracia was pregnant. Therefore, Defendants' actions did not evince an intent to restrain Gracia regardless of policy. Further, Gracia did not establish that Defendants violated the policy governing restraint of pregnant inmates.

[4] Gracia also contends that, when she was placed on a suicide watch, policy required that she be observed every five minutes, which was not done. Summer Berry placed her on suicide watch, not one of the Defendants. (Doc. 86, Ex. 4 at 23-26, 44.) Further, there is no evidence that one of the Defendants had responsibility for conducting those 5-minute observations or ensuring that someone else conducted them.

policy. If the transfer is discretionary, the decision to move an inmate to the MHU is made by medical staff and the Intake Sergeant. (Doc. 86, Ex. 6, D5SD.000188-89, ¶ 5(1).) Gracia argues there is no record that a joint decision was made regarding her transfer. If an inmate needs to be placed in a holding cell due to her behavior, however, then transfer to the MHU is required. Prior to Gracia being placed on suicide watch, which was initiated by Summer Berry not a Defendant, Gracia already had been put in a holding cell. Therefore, as Defendant Grimsey testified, Gracia's transfer to the MHU was mandated by policy.[5]

Gracia does not dispute that a BCI was required for transfer into the MHU. She proposes, however, that staff could have done an electronic body scan instead. Gracia argues that an electronic scan would have satisfied the need for Defendants to verify whether Gracia had contraband in her body. Therefore, she contends the requirement of conducting a BCI was arbitrary and purposeless. First, the record does not contain sufficient evidence to substantiate Gracia's argument that an electronic scan would satisfy the same purpose as a BCI.[6] The fact that Gracia ultimately was subjected to both a BCI and an electronic scan suggests they are not fully duplicative, and an electronic scan is not an established alternative. Further, review of the PCADC policies on searches of

---

[5] Gracia argues that transfer to the MHU is mandated only if a detainee requires transfer to a holding cell <u>after</u> she already has been placed on suicide watch. (Doc. 104 at 9-10.) PCADC policy states that a new arrestee placed on suicide watch may remain in intake or be moved to the MHU; however, if inmates need to be placed in a holding cell "to control their activity," they will be taken to the MHU. (Doc. 86, Ex. 6, D5SD.000188-89 ¶¶ 5, 6(5).) The policy does not delineate an order of events that triggers transfer to the MHU. Instead, if a person is on suicide watch and needs to be in a holding cell, both of which were true for Gracia, the policy mandates transfer to the MHU. This is the only logical interpretation of the policy because a detainee in the general intake area is under constant surveillance. That is not true for a person in an intake holding cell. Therefore, to receive the observation required for a suicide watch, the person must be transferred.

[6] Regarding an electronic scanner at the PCADC, Gracia submitted two exhibits. Exhibit 13 appears to be a specification sheet/advertisement for a Conpass Duel View Full Body Security Screening System by Adani. Gracia's Exhibit 14 appears to be a picture of an identification tag on a "Ful-Body Security Screening System" by Adani. Nothing in these exhibits connect them to a device available at the PCADC. However, PCADC policy provides for the use of a "Conpass Scanner." (Doc. 86, Ex. 9 at D1SD.000010, 13, 18-19.)

persons reveals that electronic body scans are not used as an alternative to BCIs. (Doc. 86, Ex. 9 at D1SD.000010-21.)

Second, the law does not require officers to use the least restrictive means available. Rather, the Court asks whether a BCI was reasonably related to a legitimate goal. "[S]o long as a prisoner is presented with the opportunity to obtain contraband or a weapon while outside of his cell, a visual strip search has a legitimate penological purpose." *Michenfelder v. Sumner*, 860 F.2d 328, 332-33 (9th Cir. 1988) (citing *Turner v. Safley*, 482 U.S. 78, 87 (1987)). Gracia concedes that preventing contraband from entering detention facilities is a legitimate interest, and that it is appropriate to conduct a BCI prior to moving a detainee into a housing unit (such as the MHU). (Doc. 85 at 12; Doc. 95, Ex. B at 21.) Because Gracia was entering a housing unit for the first time from outside the jail, a BCI was rational and reasonably related to a legitimate goal. Gracia has not established that conducting a BCI was excessive in relation to the goal of locating and confiscating any dangerous contraband before a detainee enters a secured housing area. Further, this Court must defer to the county's policies regarding security at the PCADC absent "substantial evidence showing [the] policies are an unnecessary or unjustified response to problems of jail security." *Olivier v. Baca*, 913 F.3d 852, 858 (9th Cir. 2019) (quoting *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 322-23 (2012)). There is not substantial evidence that the PCADC policies regarding requiring a BCI prior to transfer into the MHU, and the consequences of not complying with those policies, are unjustified in the face of the need to maintain security at the jail.[7]

**Official Capacity Liability Based on Custom and Practice**

Gracia alleges that Defendants Grimsey and Nanos are liable for the actions of their subordinates based on a policy or custom of jail employees punishing pretrial detainees by placing them in restraints. "[I]f a defendant inflicts injury when carrying out

---

[7] In her response to Defendants' Motion for Summary Judgment, Gracia contends that the BCI with which she ultimately complied occurred just before she was taken to an unsecure area for an initial appearance. (Doc. 102 at 15.) She argues it was pointless at that time. The completed BCI is not evaluated by the Court because there is no evidence that Defendants Dorsey and Grimsey were involved in that procedure.

an official policy or custom, the governmental entity may be held responsible." *Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. at 691, 694 (1978); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989) (holding a municipality may be held liable if a failure to train reflects a choice amounting to a "policy"). Although Gracia did not name Pima County as a Defendant, an official-capacity claim amounts to a claim against the county. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (citing *Monell*, 436 U.S. at 690 n.55 (holding that suits against a government representative in his official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent.")). Gracia has not established that her constitutional rights were violated by Defendants following an official policy. To the contrary, she contends Defendants violated PCADC policy. *See James v. Lee*, 485 F. Supp. 3d 1241, 1253 (S.D. Cal. 2020) (dismissing an official-capacity claim because execution of policy was not alleged to violate the plaintiff's rights, it was the failure to follow policy that was alleged).

To establish a custom of Pima County, Gracia cannot rely upon "isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *holding modified by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001). Gracia alleges Defendants acted in accord with a culture of punishing detainees that staff found insolent or did not like. In support, Gracia provided a single-page check form for each of the hundreds of inmates restrained in 2019 at the PCADC. (Doc. 86, Ex. 15.) The forms show only the reason documented for placing a pretrial detainee in restraints, many of which listed noncompliance with a search procedure. (*Id.*) This limited information offers no evidence that any of those detainees were restrained improperly or as punishment. Gracia has provided no evidence that Defendants acted in accord with a custom to punish pretrial detainees. *See Reynolds v. Wood Cnty., Texas*, No. 22-40381, 2023 WL 3175467, at *6-7 (5th Cir. May 1, 2023) (finding restraint check sheets did not provide evidence of a custom and practice of using

a restraint chair improperly regardless of length of time detainee was held in it). Thus, Gracia fails to establish that Defendants Nanos and Grimsey violated her constitutional rights while acting in an official capacity.

### Personal Capacity Liability for Supervisors

Gracia alleges that Defendants Grimsey and Nanos are liable for their conduct as supervisors of Dorsey and Grimsey, respectively. There is no vicarious liability for a § 1983 violation; therefore, a plaintiff must establish that each individual violated the Constitution by his own actions. *Starr v. Baca*, 652 F.3d 1202, 1206 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). This includes showing that a supervisor had the required intent to punish even if the constitutional violation is inflicted by another. *Iqbal*, 556 U.S. at 677. Because the Court determined that Gracia's constitutional rights were not violated, there can be no supervisory liability. However, because this issue has been briefed and argued, the Court examines it further.

A supervisor may be responsible in his personal capacity "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr*, 652 F.3d at 1207 (citing *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). This requirement may be satisfied by the "supervisor's knowledge of and acquiescence in unconstitutional conduct by his or her subordinates." *Id.* Further, "'[t]he requisite causal connection can be established . . . by setting in motion a series of acts by others' . . . or by 'knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury.'" *Id.* (citing *Redman v. Cnty. of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991); *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001)); *see Vazquez v. Cnty. of Kern*, 949 F.3d 1153, 1166 (9th Cir. 2020); *see also Watkins v. City of Oakland, Cal.*, 145 F.3d 1087, 1093 (9th Cir. 1998) (holding supervisory liability can be based on "conduct that showed a reckless or callous indifference to the rights of others.").

In the Amended Complaint, with respect to supervision, Gracia alleges only that Defendant Grimsey did not reprimand Defendant Dorsey for her improper conduct toward Gracia. Because the Court determined that Defendant Dorsey did not violate Gracia's constitutional rights or substantive PCADC policy, there was no basis for a reprimand. Further, Defendant Dorsey did not have decision-making authority with respect to the BCI or Gracia's restraint, which was the only conduct alleged to constitute punishment. In sum, Gracia has not established a causal connection between supervisory actions by Grimsey and unconstitutional conduct by his subordinates.

Gracia did not allege Defendant Nanos had personal involvement in violating her constitutional rights. Instead, she alleges Defendant Nanos is liable because staff at the PCADC did not follow policy, and he failed to supervise or control the PCADC employees. (Doc. 85 at 15.) A sheriff may be held liable for his "own culpable action or inaction in the training, supervision, or control of his subordinates[.]" *Dubner*, 266 F.3d at 968 (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991)). However, Gracia has presented no evidence regarding Defendant Nanos's role in overseeing the personnel at the PCADC. Further, Gracia has not established that Defendant Nanos had an intent to punish as is required for liability. *Iqbal*, 556 U.S. at 677. Taking all evidence in Gracia's favor, the Court finds Defendant Nanos is entitled to summary judgment on a claim of personal capacity supervisory liability.

**Qualified Immunity**

Because the Court has determined that no Defendant violated Gracia's constitutional rights, the Court need not evaluate qualified immunity. However, as this issue has been fully briefed, the Court will evaluate the second element of a qualified immunity analysis. The Court assesses whether Gracia's restraint under the circumstances was clearly established as punishment, such that Defendants Dorsey and Grimsey would have known their actions were unlawful. The qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194,

201 (2001)). For qualified immunity purposes, "the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right," and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted); *Hamby v. Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016) ("a plaintiff must prove that 'precedent on the books' at the time the officials acted 'would have made clear to [them] that [their actions] violated the Constitution.'") (quoting *Taylor v. Barkes*, 575 U.S. 822, 827 (2015)). Regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991).

It is Gracia's burden to show "that the rights allegedly violated were 'clearly established.'" *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017).  In evaluating qualified immunity, the Court looks at the law clearly established at the time of the incident, which occurred in October 2019. Gracia contends that a pretrial detainee's right not to be punished has been clearly established for hundreds of years. (Doc. 102 at 13.) This is not the level of specificity required by the Supreme Court when analyzing qualified immunity. The Ninth Circuit has emphasized that "[a]lthough a plaintiff need not find 'a case directly on point, . . . existing precedent must have placed the . . . constitutional question beyond debate.'" *Hamby*, 821 F.3d at 1091 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also City & Cnty. of San Fran. v. Sheehan*, 575 U.S. 600, 613 (2015) ("We have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality."). Except in a rare case where an officer's conduct is obviously unlawful, a plaintiff must identify a sufficiently analogous case that would have alerted a defendant that his conduct violated a right to be free of punishment. *Vazquez*, 949 F.3d at 1164, 1165-66 (holding "it is 'obvious' that a juvenile corrections officer should not sexually harass or abuse a juvenile ward as it is

always wrong") (citing *Sharp v. Cnty. of Orange*, 871 F.3d 901, 912 (9th Cir. 2017)). Gracia's case, which involved conducting a BCI and restraining a pretrial detainee, did not involve actions that were unquestionably unlawful.

In *Bell*, the Supreme Court found constitutional visual BCIs on detainees after all contact visits, to prevent and deter smuggling of contraband, as long as the search was conducted reasonably and was not abusive. 441 U.S. at 558, 560, 561-62 (finding jail security to be a nonpunitive objective and that the body cavity searches were a reasonable response to those concerns). Subsequently, the Supreme Court found constitutional visual BCIs on all detainees prior to admitting them into the general population. *Florence*, 566 U.S. at 338-39; *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 980-81 (9th Cir. 2010) (upholding strip searches commensurate with those in *Bell* for all inmates entering the general jail population).

When there is evidence of a legitimate security need, and the absence of an intent to punish, the Ninth Circuit has held that the use of a restraint chair is not unconstitutional. *Dalluge v. Coates*, 341 F. App'x 310, 310-11 (9th Cir. 2009). Similarly, the Fifth Circuit granted qualified immunity for an occurrence in 2018, when a pretrial detainee was held in a restraint chair for 14 hours (during the last hour of which he urinated on himself), for behaving combatively and refusing to respond to booking questions. *Reynolds*, 2023 WL 3175467, at *4 (acknowledging that there was a factual dispute regarding whether the detainee continued to pose a threat throughout the 14 hours). The cases discussed so far made clear that, as of 2019, it was constitutional to: (1) conduct a reasonable visual BCI of a pretrial detainee prior to placing them with general population inmates, and (2) to restrain a pretrial detainee for a period of hours for purposes of a legitimate security need. Based on this law, it was not clearly established in October 2019 that Defendants would have known their actions violated clearly established law.

The Court identified one Ninth Circuit case that addresses restraint of a pretrial detainee for failure to comply with a visual body cavity inspection. In that case, officers

- 19 -

would leave non-compliant female detainees chained to their cell door essentially naked for hours, visible to male guards on patrol. *Shorter v. Baca*, 895 F.3d 1176, 1188 (9th Cir. 2018.) The court distinguished the circumstances from those present in *Florence*, because the searches were not for initial admission to the jail but were conducted upon return from court where the detainee had been shackled and under constant monitoring. *Id.* (noting the procedures were not justified on the same basis as the searches in *Florence*). Officials in the *Shorter* case admitted the practices did not serve a legitimate penological purpose, and jail policy provided an alternative less abusive option. *Id.* at 1188-89. The circuit court was not asked to decide the constitutionality of the practice, it held only that the circumstances did not warrant an instruction offering deference to jail officials because the search procedures were an "unnecessary, unjustified, or exaggerated response to concerns about jail safety." *Id.* at 1191.

Here, as seen in the video, Gracia was placed in a smock that covered her from the neck to below the knees (contrary to her assertion that she was naked). She was not subject to a repeat search while housed with the general population; rather, she was subject to an initial search as a new detainee being admitted into a housing unit. Further, Defendants rely upon an identified penological purpose for the search and restraint. And their actions reasonably complied with jail policy. *Vazquez*, 949 F.3d at 1164, 1165-66 ("One factor a court can look at to evaluate whether an officer would have known his conduct was unlawful, is whether it violated policy or served no legitimate penological purpose."); *cf. Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."). After review of this caselaw, the Court finds Defendants Grimsey and Dorsey are entitled to qualified immunity because it was not clearly established that their conduct was unlawful.

Gracia identified only one case in opposing Defendant's request for qualified immunity, *Lopez v. Youngblood*, 609 F. Supp. 2d 1125, 1140-41 (E.D. Cal. 2009). In *Lopez*, the court concluded that strip searching inmates in small groups violated the

Fourth Amendment but did not violate the inmates' due process rights under the Fourteenth Amendment. *Id.* at 1138-39, 1141. The court also denied summary judgment to defendants on the claim that strip searching inmates after the court has ordered them released violated their Fourth Amendment rights. *Id.* at 1139-40. The *Lopez* case, which is out-of-district, is factually distinguishable from the circumstances present here. Gracia was not subjected to a group search, did not allege a violation of the Fourth Amendment, and was not searched after a court granted her release. Therefore, *Lopez* has no bearing on this Court's evaluation of the clearly established law in October 2019, and Defendants entitlement to qualified immunity.

**Gross Negligence**

Gracia alleged all Defendants acted with gross negligence. She did not seek summary judgment as to this claim, but Defendants requested summary judgment in their favor with respect to gross negligence.

Under Arizona law, a person acts with gross negligence if "he acts or fails to act when he knows or has reason to know facts which would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result." *Walls v. Ariz. Dept. of Pub. Safety*, 826 P.2d 1217, 1221, 170 Ariz. 591, 595 (Ct. App. 1991); *see also Noriega v. Town of Miami*, 243 Ariz. 320, 328, 407 P.3d 92, 100-01 (Ct. App. 2017) (finding gross negligence equates to reckless indifference to another's safety). Gross or wanton negligence is "highly potent, and when it is present it fairly proclaims itself in no uncertain terms. It is 'in the air,' so to speak. It is flagrant and evinces a lawless and destructive spirit." *Scott v. Scott*, 252 P.2d 571, 575, 75 Ariz. 116, 122 (1953); *Merritt v. Arizona*, 425 F. Supp. 3d 1201, 1231-32 (D. Ariz. 2019) (quoting *Cullison v. City of Peoria*, 584 P.2d 1156, 120 Ariz. 165 (1978)). Summary judgment should be denied as to a gross negligence claim if there is more than slight evidence, not bordering on conjecture, to support it. *Walls*, 826 P.2d at 1221, 170 Ariz. at 595 ("A court may

withdraw the issue of gross negligence from the jury only when no evidence is introduced that would lead a reasonable person to find gross negligence.").

Gracia alleges that summary judgment as to gross negligence should be denied based on the following facts: Defendant Dorsey knew Gracia had back pain; there was a less-intrusive manner to search for contraband; policy forbid restraint on a board while Gracia was in a secure cell; Gracia was intoxicated and at risk of passing out and suffocating from vomit; and Defendants should have known that checks every 5 or 15 minutes were required due to the suicide watch and restraint, respectively. The Court first looks at Gracia's policy-based arguments. As discussed earlier, PCADC policy did not allow use of a Conpass Scanner as an alternative to conducting a BCI. Gracia cites to a policy that forbids restraints when a person in a secured cell issues threats but does not have the means to carry them out. (Doc. 86, Ex. 9, D1SD.000004 ¶ II(D)(1). Gracia was not in a secure cell at the time the decision was made to restrain her. Further, she was being restrained, not for verbal threats, but for failure to complete the BCI required to place her in the MHU. Until a BCI was completed, PCADC staff could not be assured that she did not have means to carry out harm to herself or others. Therefore, the policies cited by Gracia do not evidence gross negligence.

Gracia reported to Defendant Dorsey that she had back pain. However, awareness that a person has back pain would not alert a reasonable person that performing a BCI or restraining that person on a board would create an unreasonable risk of bodily harm or would involve a high probability of causing substantial harm. In fact, Gracia has not alleged that she incurred harm to her back beyond temporary pain. Although Gracia had a substantial BAC when she entered the jail, there is no evidence Defendants possessed that information. Further, Gracia testified that she "sobered up," and operated with more clear thinking shortly after arriving at the jail. (Doc. 95, Ex. B at 34-35.) For those reasons, a reasonable person would not have had notice that restraining Gracia on the board at 4:30 a.m. created a high probability of substantial harm due to the risk of vomiting while

passed out. Further, while restrained on the board, Gracia had the ability to turn her head from side to side and to sit up. Even if Defendants knew that frequent checks on Gracia were required by policy, a reasonable person would not have identified an unreasonable risk of bodily harm in not conducting checks more than once per hour because Gracia was fully restrained. For the reasons discussed above, the Court finds Gracia has not identified sufficient evidence of reckless indifference to her safety. Therefore, Defendants are entitled to summary judgment on Gracia's gross negligence claim.

## CONCLUSION

Construing all facts in Gracia's favor, the Court finds Defendants are entitled to summary judgment on all claims. First, there is no evidence any Defendant intended to punish Gracia. If the Court were to find evidence of intent to punish and harm to Gracia, the Court finds Defendants Grimsey and Dorsey are entitled to qualified immunity. Second, there is no evidence of a custom or practice of restraining inmates for punishment; therefore, Defendants are not liable in their official capacity. Third, there is no evidence that Defendants acted with gross negligence. Finally, because the Court finds Defendants are entitled to summary judgment on Gracia's three claims, it does not address Defendants' request to dismiss Gracia's prayer for punitive damages.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 85) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Doc. 94) is **GRANTED** as to all claims.

**IT IS FURTHER ORDERED** that the Clerk of Court should enter judgment in Defendants favor and dismiss this case.

Dated this 26th day of May, 2023.

Honorable Lynnette C. Kimmins
United States Magistrate Judge

- 23 -